# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| [UNDER SEAL]<br><br>       Plaintiffs,<br><br>       v.<br><br>[UNDER SEAL]<br><br>       Defendants. | **Civil Action No._____**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**FILED IN CAMERA AND UNDER SEAL**

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* PHILIPPA KRAUSS and JULIE WHITE, <br><br> Plaintiffs, <br><br> v. <br><br> GUARDIAN ELDER CARE HOLDINGS, INC., GUARDIAN LTC MANAGEMENT, INC., GUARDIAN ELDER CARE MANAGEMENT, INC., GUARDIAN ELDER CARE MANAGEMENT I, INC., and GUARDIAN REHABILITATION SERVICES, INC., <br><br> Defendants. | **Filed Under Seal pursuant to** <br><br> **31 U.S.C. § 3730(b)(2)** <br><br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 4

III.    PARTIES ............................................................................................................... 5

IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO
        DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ................................. 8

        A.      False Claims Act ....................................................................................... 8

        B.      Medicare .................................................................................................... 8

                (i)     Medicare Part A and B Coverage of Skilled Nursing Facility
                        Rehabilitation Therapy.................................................................. 8

                (ii)    Medicare Part A Reimbursement Rates.................................... 11

                (iii)   Medicare Part B Reimbursement ............................................. 14

                (iv)    Statements And Claims To Medicare For Payment Of Skilled Nursing
                        Facility Rehabilitation Therapy ............................................... 16

        C.      Medicaid .................................................................................................. 18

                (i)     Medicaid Coverage Under Pennsylvania Law.......................... 18

                (ii)    Medicaid Reporting Requirements ........................................... 20

V.      GUARDIAN HIERARCHY ............................................................................... 22

VI.     ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS............................... 26

        A.      Guardian Systematically Pressures Its Rehabilitation Therapists to Meet
                Corporate Ultra High Targets and Length of Stay Targets in Order to
                Maximize Its Medicare Revenue ............................................................ 26

        B.      Guardian Manipulated the Minutes of Billed Therapy to Maximize
                Reimbursement Without Regard To Medical Necessity ....................... 38

        C.      Guardian Systematically Pressures its Staff to Meet Unit of Therapy
                Benchmarks in Order to Maximize its Medicare Part B Revenue....... 41

        D.      Guardian Systematically Pressures Its Rehabilitation Managers and
                Therapists to Meet Corporate CMI Targets in Order to Maximize Its
                Medicaid Revenue .................................................................................... 45

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

VII.   COUNTS ................................................................................................ 59

VIII.  PRAYER FOR RELIEF ........................................................................... 61

IX.    JURY DEMAND ....................................................................................... 62

## I.   INTRODUCTION

1.      Medicare pays skilled nursing facilities ("SNF") a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare Part A patients (or "beneficiaries").  The daily rate that Medicare pays a nursing facility depends heavily on the rehabilitation needs of the beneficiaries.  The highest daily rate that Medicare will pay a nursing facility is reserved for those beneficiaries that require "Rehab Ultra High" ("RU") level of skilled rehabilitation therapy, or a minimum of 720 minutes per week of skilled therapy from at least two therapy disciplines (e.g., physical, occupational, and speech).  The patients requiring Ultra High care fall within the RU level Resource Utilization Group ("RUG") which provides the highest level of reimbursement.  This RU therapy level is intended for the most clinically complex patients who require rehabilitative therapy well beyond the average patient.

2.      From at least 2012 to the present, Guardian[1], which operates 28 skilled nursing facilities, has been engaged in a systematic scheme to maximize the number of days it billed to Medicare at the RU level.  Guardian accomplished this by setting aggressive targets regarding RU levels of therapy and average lengths of stay for beneficiaries that were completely unrelated to its beneficiaries' actual conditions, diagnoses, or needs.  Guardian then reinforced those targets, among others, at corporate and facilities' meetings, trainings and presentations, through regular phone calls, emails, text messages and visits by corporate personnel, by imposing performance reviews and action plans on underperforming facilities.  While Guardian punished those facilities and employees that failed to meet its RU and average length of stay targets, it rewarded and applauded those that met its targets.  As part of its goal to maximize Medicare

---

[1] Guardian refers to Guardian Elder Care, its wholly owned subsidiary Guardian Rehab, and its parents, subsidiaries and affiliates as defined in Paragraphs 16-22.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

payments, Guardian also frequently overrode or ignored the recommendations of its own therapists and unnecessarily delayed discharging beneficiaries from its facilities.

3.     As a direct result of Guardian's corporate pressure to maximize its RU billings, Guardian therapists provided and continue to provide Medicare beneficiaries with excessive amounts of therapy that is not medically reasonable and necessary, and even harmful.  To reach the inflated RU targets, Guardian also pressured Rehab Managers and therapists to report time spent on initial evaluations as therapy in order to avoid the Medicare prohibition on counting initial evaluation time as reimbursable therapy time.

4.     In addition to reflecting a patient's rehabilitation therapy needs, each RUG also reflects the patient's ability to perform certain activities of daily living ("ADL"), like eating, bathing, toileting, bed mobility and transfers (*e.g.*, from a bed to a chair).   A patient's ADL score (ranging  from A to C) reflects his or her dependency level when performing an ADL.

5.     From at least 2012 through present, in order to achieve the Company's financial goals, Guardian artificially increased patient's ADLs by setting up aggressive ADL benchmarks for providing assistance services without regard to medical necessity or need.

6.     Similarly, from at least 2012 through present, Guardian bills Medicare for Part B services that are not medically reasonable and necessary.  It engages in a systematic scheme to maximize the number of therapy units it bills under Part B, setting therapy unit targets that are unrelated to patients' actual conditions, diagnoses, or needs.

7.     Guardian pressured Relators Philippa Krauss ("Krauss") and Julie White ("White") (together, the "Relators") and their staff to (1) inflate the RUG levels; (2) maximize the number of days it billed to Medicare at the RU level, regardless of medical necessity; (3) increase average lengths of stay; (4) plan the minimum number of minutes of therapy required to

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

bill at the highest reimbursement level while discouraging the provision of therapy in amounts beyond that minimum threshold, despite the Medicare requirement that the amount of care provided be determined by patients' clinical needs; (5) arbitrarily shift the number of minutes of planned therapy between different therapy disciplines to ensure targeted reimbursement levels were achieved; (6) report that time spent on initial evaluations was therapy or education time in order to avoid the Medicare prohibition on counting initial evaluation time as reimbursable therapy time; (7) inflate the ADL levels; (8) report that time spent providing unskilled palliative care was time spent on reimbursable skilled therapy and (9) artificially increase the number of therapy units under Medicare Part B without regard to medical necessity

8.      Guardian's corporate strategy and pressure succeeded in significantly increasing the number of days it billed at the RU level and therefore inflating the money it received from Medicare.  Throughout the relevant period, Guardian established targets to bill 85% of its patient days at the RU level — a level far in excess of the nationwide RU average of 60.9% among all SNFs during that same period.

9.      Skilled nursing facilities also get paid by the State Medicaid programs for long-term care patients.  State Medicaid programs pay a daily rate to SNFs based in part on the facilities' "case mix index," or CMI.  The CMI is a numeric value that describes the average resource use based on the needs of residents.  The CMI score increases when long-term care patients are receiving rehabilitation therapy.

10.     From at least 2012 to the present, Guardian has been orchestrating the scheme to enroll Medicaid patients in therapy to increase the facility's CMI without regard to medical necessity or clinical needs of the patients.  Not only did this unnecessary therapy increase

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Guardian's Medicaid funding through the resulting increase in CMI, but Guardian was also reimbursed by Medicare Part B for the unnecessary therapy itself.

11.     Facility's CMI is also increased when patients need assistance to perform certain ADLs.  Guardian pressured its staff to achieve high ADL level benchmarks to increase its facilities CMI and thus, the Company's profits.

12.     Because Guardian knowingly submitted false claims to the Medicare and Medicaid programs for medically unreasonable, unnecessary and unskilled therapy services that are not covered by Medicaid and Medicare Part A and Part B benefit, and used false records and statements to support those false claims or failed to maintain records as required, Relators bring this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33.

## II.     JURISDICTION AND VENUE

13.     Relators bring this action on behalf of themselves and on behalf of the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and seek damages in connection with violations of 31 U.S.C. § 3729 *et seq*.  This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

14.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District.  In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District.  31 U.S.C. § 3732(a).

15.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

16.     Relators' claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).[2]

17.     To the extent that there has been a public disclosure unknown to the Relators, the Relators are the "original source" under 31 U.S.C. § 3730(e)(4)(B).[3]   The Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information.

## III.   PARTIES

18.     Plaintiff-Relator Philippa Krauss was employed by Guardian as a Rehabilitation Manager for Guardian Rehab Forest Park in Pennsylvania from March of 2012 until her resignation on February 15, 2013.   As a Rehabilitation Manager, Relator Krauss has direct knowledge of Defendants' concerted and repeated efforts to overbill Medicare and Medicaid by, among others, inflating the RUG and ADL levels, illegally manipulating the therapy minutes, increasing the length of stay and inflating facilities' CMI.   She conducted her own investigations in furtherance of a False Claims Act *qui tam* action.

19.     Plaintiff-Relator Julie White was employed by Guardian Rehab as a full-time therapist in the Forest Park facility beginning in July of 2012.   In March of 2013 she became an interim Rehabilitation Manager.   She was promoted to Rehabilitation Manager on August 22,

---

[2] To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.*, 31 U.S.C. § 3730(e), as amended, October 27, 1986 and May 20, 2009).
[3] *Id.*

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

2013 and served in that capacity until June 25, 2014.  Relator White has direct knowledge of Defendants' concerted and repeated efforts to overbill Medicare and Medicaid by, among others, inflating the RUG and ADL levels, manipulating the therapy minutes to increase billing, increasing the length of stay and inflating facilities' CMI.  She conducted her own investigations in furtherance of a False Claims Act *qui tam* action.

20.     The United States is a plaintiff in this action.  Throughout the Relevant Time Period, the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") were agencies of the United States and their activities, operations and contracts were paid from the United States funds.  During the relevant time periods, Defendants provided services paid for by the Medicare and Medicaid programs.

21.     Defendant Guardian Elder Care Holdings, Inc. ("GECH") is a Pennsylvania corporation with its headquarters at 8796 Route 219, Brockway, PA 15824-6010.  GECH's board of directors consists of Eddy Inzana, Peter Varischetti, Nicholas Varischetti, Frank A. Varischetti and Steven Varischetti.  GECH has a direct ownership interest in seven Guardian SNFs.

22.     Defendant Guardian LTC Management, Inc. is a Pennsylvania corporation doing business as Guardian Elder Care ("GEC").  GEC has its headquarters at 8796 Route 219, Brockway, PA 15824-6010.[4]  GEC is a privately owned for-profit healthcare organization providing services through 28 skilled nursing facilities (the "Guardian SNFs"), with 24 located in Pennsylvania, three in Ohio, and one in West Virginia.  GEC operates through a number of subsidiaries and related entities.  In addition to providing services through the SNFs, GEC has an ownership interest in 17 of the SNFs identified herein.

---

[4] Guardian Elder Care is a registered fictitious name owned by Guardian LTC Management, Inc.  *See* www.corporations.state.pa.us.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

23.     Guardian Elder Care Management, Inc. ("GECM") is a Pennsylvania corporation with its headquarters at 8796 Route 219, Brockway, PA 15824-6010.  GECM retains operational and managerial control over some of the Guardian SNFs and maintains an ownership or partnership interest in at least five of the SNFs.

24.     Guardian Elder Care Management I, Inc. ("GECMI") is a Pennsylvania corporation with its headquarters at 8796 Route 219, Brockway, PA 15824-6010.  GECMI retains operational and managerial control over several of the Guardian SNFs and maintains an ownership or partnership interest in at least seven of the SNFs.

25.     Guardian Rehabilitation Services, Inc. ("Guardian Rehab") is a Pennsylvania corporation with its headquarters at 8796 Route 219, Brockway, PA 15824-6010.  Guardian Rehab is a wholly owned subsidiary of Guardian Elder Care.[5] Guardian Rehab provides physical therapy, occupational therapy and speech therapy at SNF sites.

26.     Throughout this Disclosure Statement, "Guardian"[6] is used to refer to all Defendants.

27.     All Defendants have the same board of directors, consisting of Eddy Inzana, Peter Varischetti, Nicholas Varischetti, Frank A. Varischetti and Steven Varischetti.  All Guardian Defendants also share the same address 8796 Route 219, Brockway, PA 15824-6010.

---

[5] Guardian Rehab's Personnel Policies Handbook refers to Guardian Elder Care as its owner.
[6] Allegations contained in this Complaint encompass conduct by Guardian Elder Care, its wholly owned subsidiary Guardian Rehab, and its parents, subsidiaries and affiliates.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

## IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. False Claims Act

28. The FCA provides, in pertinent part, that any person who:

    a. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

    b. knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim…

                \* \* \*

    is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1).

29. The FCA further provides that "knowing" and "knowingly"

    a. mean that a person, with respect to information-

        i. has actual knowledge of the information;
        ii. acts in deliberate ignorance of the truth or falsity of the information; or
        iii. acts in reckless disregard of the truth or falsity of the information; and

    b. require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

30. The FCA, at 31 U.S.C. § 3729(a)(1)(G), provides that a person is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation.

### B. Medicare

#### (i) Medicare Part A and B Coverage of Skilled Nursing Facility Rehabilitation Therapy

31. Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.   42

8

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

U.S.C. §§ 426, 426A.

32.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

33.     Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.,* spell of illness) following a qualifying hospital stay of at least three consecutive days.  42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b), (c).  The conditions that Medicare imposes on its Part A SNF benefit include:  (1) that the patient requires skilled nursing care or skilled rehabilitation  services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a  practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment  during a qualifying hospital stay or that arose while the patient was receiving care in a skilled  nursing facility (for a condition treated during the hospital stay).  42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

34.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter.     42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

35.     To be considered a *skilled* service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists.  42 C.F.R. § 409.31(a).

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

36.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking).   42 C.F.R. § 409.33(d).   "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature.   Those services can be performed by supportive personnel; *e.g.*, aides or nursing personnel . . . ."   Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

37.     Medicare Part B, subject to certain conditions, covers outpatient physical therapy services furnished to an inpatient of a SNF who requires such services but has exhausted, or is otherwise ineligible for benefit days under Medicare Part A.  42 C.F.R. 410.60(b).

38.     The conditions that Medicare imposes on its Part B SNF benefit include: (1) that the services are reasonable and medically necessary, (2) that the patient receiving the services be under the care of a physician, (3) that the services be furnished pursuant to a written plan of care that is periodically recertified by the physician, and (4) that the services be furnished by or under the direct supervision of qualified personnel.   The plan of care requirements under Part B are substantially the same as those required under Part A.  42 C.F.R. § 410.60.

39.     In order to qualify for reimbursement under Medicare Part B, therapy services must constitute skilled therapy; that is, such services must either qualify as rehabilitative therapy or, if consisting of maintenance therapy, must require the skills of a therapist due to the acute condition of the patient.   42 C.F.R. § 410.60.   Medicare Part A and B will only cover those services that are reasonable and necessary.   42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or

10

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

to improve the functioning of a malformed body member").; *also* 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

40.    "Reasonable" and "necessary" services in the context of skilled rehabilitation therapy means that the services must be (1) consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

41.    In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

### (ii)    Medicare Part A Reimbursement Rates

42.    Under the prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient.  63 Fed. Reg. 26,252, 26,259-60.

43.    The daily PPS rate that Medicare pays a nursing facility depends, in part, on the RUG to which a patient is assigned.   Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation  services to beneficiaries with similar

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

characteristics or resource needs.[7]  SNFs.   77 Fed. Reg. 46,214 (Aug. 6, 2013).

44.    There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy:  Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

45.    The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period").   The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-IV classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
| --- | --- |
| RU = Ultra high | minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |
| RV = Very high | minimum 500 minutes per week total therapy; from at least one  therapy discipline provided at least 5  days per week |
| RH = High | minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RM = Medium | minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy |
| RL = Low | minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy |

63 Fed. Reg. at 26,262

46.    Medicare pays the most for those beneficiaries that fall into the RU RUG  level.

The RU RUG level is "***intended to apply only to the most complex cases  requiring rehabilitative***

---

[7] There are 66 RUGs in the "RUG-IV" classification system providing separate PPS rates for urban and rural SNFs. *See* 77 Fed. Reg. 46,214 (Aug. 6, 2013) (Tables 4 and 5).  These 66 RUGs include 23 different Rehabilitation plus Extensive Services and Rehabilitation groups, representing 10 different levels of rehabilitation services depending upon the ability of the patient to perform ADLs, and the need for extensive services, as detailed below.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

*therapy well above the average amount of service time.*"   63 Fed. Reg. 26,252, 26,258 (May 12, 1998) (emphasis added).

47.    In addition to reflecting a patient's rehabilitation therapy needs, each RUG also reflects the patient's ability to perform certain activities of daily living ("ADL"), like eating, bathing, toileting, bed mobility and transfers (*e.g.*, from a bed to a chair).   A patient's ADL score (ranging  from A to C) reflects his or her dependency level when performing an ADL.   A very dependent  patient, who cannot perform any of the ADLs without assistance, would generally receive an  ADL score of "C," while a patient who could perform the ADLs without assistance would receive an ADL score of "A."

48.    In addition to the ADL scores of A, B, and C, Medicare provides "X" and "L" ADL scores for those beneficiaries that require "extensive services" in addition to rehabilitation therapy.   Extensive services include ventilator, tracheostomy care or quarantine for infectious diseases.   A very dependent rehabilitation patient who requires more extensive services would generally receive an ADL score of "X," while a patient who needs only one of the extensive services might receive an ADL score of "L."

| RUG Rates:  Federal Rates for Fiscal Year 2012[8] (URBAN)[9] | | | | |
|---|---|---|---|---|
| | **Rehab with Extensive Services** | | **Rehab without Extensive Services** | |
| **RUG Level** | **X** | **L** | **C** | **B** | **A** |
| RU | $ 737.08 | $ 721.01 | $ 558.79 | $ 558.79 | $ 467.23 |
| RV | $ 656.06 | $ 588.60 | $ 479.38 | $ 415.13 | $ 413.52 |
| RH | $ 594.39 | $ 530.16 | $ 417.71 | $ 375.95 | $ 330.97 |
| RM | $ 545.24 | $ 500.27 | $ 366.95 | $ 344.47 | $ 283.43 |
| RL | $ 478.85 | (not applicable) | (not applicable) | $ 356.78 | $ 229.89 |

---

[8] For Medicare billing the fiscal year begins on October 1.  Therefore fiscal year 2012 was October 1, 2011 through September 30, 2012.
[9] 76 Fed. Reg. 48,486 (Aug. 8, 2011).  *See also* http://www.gpo.gov/fdsys/pkg/FR-2011-08-08/pdf/2011-19544.pdf, table 4

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

49.     To provide a sense of the tremendous impact that a RUG level or ADL score has on the Medicare daily rate, provided below are summary charts reflecting the adjusted rates that Medicare paid nursing facilities for rehabilitation beneficiaries in fiscal years 2012 and 2013. Medicare adjusts base rates annually and based on locality.  42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

| RUG Rates:  Federal Rates for Fiscal Year 2013 (URBAN)[10] | | | | |
|---|---|---|---|---|
| | **Rehab with Extensive Services** | | **Rehab without Extensive Services** | | |
| **RUG Level** | **X** | **L** | **C** | **B** | **A** |
| RU | $ 750.66 | $ 734.30 | $ 569.08 | $ 569.08 | $ 475.84 |
| RV | $ 668.14 | $ 599.44 | $ 488.21 | $ 422.77 | $ 421.14 |
| RH | $ 605.35 | $ 539.92 | $ 425.41 | $ 382.88 | $ 337.08 |
| RM | $ 555.29 | $ 509.49 | $ 373.72 | $ 350.82 | $ 288.66 |
| RL | $ 487.67 | (not applicable) | (not applicable) | $ 363.35 | $ 234.12 |

**(iii)     Medicare Part B Reimbursement**

50.     To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare administrative contractors ("MACs").  42 U.S.C. § 1395u.  MACs are responsible for processing the payment of Part B claims to providers on behalf of CMS.  *Id.*

51.     Part B payments are based on a fee schedule for the specific items or services provided.  42 U.S.C. §§ 1395I(a)(2)(B) and yy(e)(9).  They are not, contrary to Part A payments, based on a daily rate. "[W]here a fee schedule exists for the type of service, the fee amount will be paid.  Where a fee does not exist on the Medicare Physician Fee Schedule (MPFS) the particular service is priced based on cost." *Id.*  SNF claims are submitted on CMS-1450 using Healthcare Common Procedure Coding System (HCPCS) codes to report the number of units for outpatient rehabilitation services.  42 C.F.R. § 424.32.

52.     There are two types of HCPCS therapy codes: timed and untimed.  Untimed codes

---

[10] 77 Fed. Reg. 46,214 (Aug. 2, 2012).  *See also* http://www.gpo.gov/fdsys/pkg/FR-2012-08-02/pdf/2012-18719.pdf, table 4.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

are based on the number of times a procedure is performed in a day.   Medicare Claims
Processing Manual, Ch. 5, § 20.2.   Time-based codes, such as outpatient therapy service codes,
allow for variable billing that is based on 15-minute increments, where each increment is one (1)
billing unit.   *Id.*   A provider can only bill for units of time that are spent in direct contact with the
patient.   *Id.* at Ch. 5, § 20.3.   In 1998, Medicare established and published its own requirements
regarding these time-based 15 minute codes.   *Id.* at Ch. 5, § 20.2.   At the heart of these
requirements is the 8-minute rule, which dictates that in order to bill for each additional time-
based code, the therapist must spend at least eight (8) minutes of each unit providing direct
service to the patient.   That means, in calculating the number of billable units for a particular
date of service, the total minutes of skilled, one-on-one therapy are added and the total is divided
by 15.   If eight or more minutes are left over, a provider can bill for one more unit; if seven or
fewer minutes remain, a provider cannot bill an additional unit.   The breakdown of these units is
as follows:

| Units | Number of Minutes |
|---|---|
| 1 unit: | ≥ 8 minutes through 22 minutes |
| 2 units: | ≥ 23 minutes through 37 minutes |
| 3 units: | ≥ 38 minutes through 52 minutes |
| 4 units: | ≥ 53 minutes through 67 minutes |
| 5 units: | ≥ 68 minutes through 82 minutes |
| 6 units: | ≥ 83 minutes through 97 minutes |
| 7 units: | ≥ 98 minutes through 112 minutes |
| 8 units: | ≥ 113 minutes through 127 minutes |

The pattern remains the same for treatment times in excess of 2 hours.   *Id.* at Ch. 5, § 20.3(C).

53.   "All Part B claims for services furnished to SNF residents (whether filed by the
SNF or by another entity) must include the SNF's Medicare provider number and appropriate
HCPCS coding."   42 C.F.R. § 424.32(a)(5).   Claims on Form 1450 are submitted to the MAC.
Under Medicare Part B, CMS makes retrospective payments through MACs to Medicare

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

providers for patient services.

54.     Providers must certify the accuracy and completeness of the information contained on the CMS-1450.   Every paper or electronic submission includes the following "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.   That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

55.     Medicare requires that the patients who are receiving physical therapy have a plan of care written by the physical therapist and approved by the treating provider.   The plan of care must identify the goals for the treatment, and type, amount, duration and frequency of the therapy services.   Medicare Benefit Policy Manual, Chapter, 15, § 220.1.2(A) and (B).

**(iv)     Statements And Claims To Medicare For Payment Of Skilled Nursing Facility Rehabilitation Therapy**

56.     Medicare requires nursing facilities periodically to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS").   The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing and therapy to that patient.

57.     In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. Additionally, a nursing facility must assess each patient on day 1, 2 or 3 following the last date of rehabilitation.   The date the facility performs the assessment is known as the assessment reference date ("ARD").   A nursing facility may perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after.   When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the

16

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

seven days preceding the assessment reference date. As discussed above, this seven day assessment period is referred to as the "look-back period."

58.     The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section O of the MDS ("Special Treatments, Procedures and Programs") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look-back period. In particular, Section O shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (*i.e.,* physical therapy, occupational therapy, and speech-language pathology and audiology services) and Section G - activities of daily living (ADL) assistance. The information contained in Section G and O directly impacts the rehabilitation RUG level to which a patient will be assigned.

59.     In most instances, the RUG level determines Medicare payment prospectively for a defined period of time. 63 Fed. Reg. at 26,267.[11] For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

60.     Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265. The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that

---

[11] Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14. *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

residents receive appropriate and quality care, and as a basis for payment from federal funds."  Minimum Data Set (MDS) – Version 3.0 for Nursing Home Resident Assessment and Care Screening, Sec. Z0400.[12]

61.     Since October 1, 2010, nursing facilities transmit the MDS data directly to CMS. 42 C.F.R. § 483.20(f)(3).

62.     A patient's RUG information is incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment amount owed to the nursing facility.  The HIPPS code must be included in the CMS-1450, also known as a UB-04 form, which nursing facilities submit electronically to Medicare for payment. Medicare Claims Processing Manual, Ch. 25, § 75.5.   Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450.  63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

### C.     Medicaid

#### (i)     Medicaid Coverage Under Pennsylvania Law

63.     Medicaid Program, and specifically, Pennsylvania's Medicaid Program, pays a daily rate for long-term care patients at Guardian facilities in Pennsylvania.

64.     Much of Guardian's population consists of patients whose stay is covered by Medicaid, including patients who have exhausted the 100 days of coverage under Medicare Part A.  State Medicaid programs reimburse skilled nursing facilities based on a combination of factors.  One of those factors is the facilities' "case mix index," or CMI.  The CMI is a number value score that describes the relative resource use for the average resident in each of the groups

---

[12] 42 U.S.C. § 1395i-3

FILED UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)

under the RUG-III[13] classification system based on the assessed needs of the resident.  Thus, a facility's CMI is calculated based on the characteristics of the individual patients in the facility.  An individual's value in calculating the facility's CMI is increased when that individual is participating in rehabilitation therapy.

65.     The facility's CMI acts as a multiplier affecting the facility's daily reimbursement rate from Medicaid.  Pennsylvania MA Case-Mix Reimbursement System, Resident Data Reporting Manual ("Reporting Manual"), Section 7-1; Pa Code § 1187.96.  For example, if a facility's regular daily rate is $100, and the facility's CMI is 1.15, the daily reimbursement rate would increase to $115.

66.     Guardian Facilities' CMI, including Forest Park's CMI, was officially calculated based on the Medicaid funded residents in the building at midnight on each of four "picture dates" throughout the year.  These picture dates were the first calendar day of the second month of each calendar quarter *i.e.*, February 1, May 1, August 1, and November 1.  Pa. Code § 1187.2.  The facility's CMI would be calculated on that date as an average of each patient's value based on the assessment during that period.  Pa. Code § 1187.94.

67.     A SNF's CMI increases for each patient who has had therapy sessions for at least thirty minutes per day, five days per week.  On the date of each patient's quarterly, annual and significant change assessment, there is a 7 day look-back period.  If there were 5 days and 150 minutes of therapy provided, a patient would get a higher value.  This assessment also looks at the amount of daily living assistance needed in the prior seven days.  As a result, Guardian has

---

[13] State Medicaid agencies have the option to continue to use the RUG-III classification systems or adopt the RUG-IV system.  Pennsylvania continues to use the RUG III system.  *See* 55 PA. Code Sec. 1187.92

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

an incentive to enroll Medicaid patients in therapy and provide nursing assistance to increase their contribution to the facility's CMI in the five days prior to each assessment in each quarter whether or not the therapy is medically necessary. Consequently, Guardian Management pressured therapists and rehabilitation managers including Krauss and White and continues to pressure its staff to "pick up" patients for therapy on at least 5 days each quarter to coincide with the qualifying assessment for that picture date, whether or not such therapy was medically necessary. Moreover, such therapy was often ended immediately following the assessment completion.

68.     On the picture date all of the values for every quarterly, annual and significant change assessment are averaged over all Medicaid patients. The resulting number is the payment multiplier for each day for every patient in the facility who has their nursing home stay paid by Medicaid. If a patient was on therapy the previous quarter, and this quarter he/she is not, the patient's "value" would drop - and so would the overall CMI. Guardian uses a CMI workbook to track every change in therapy in each quarter, so the company's aggressive benchmarks can be met.

69.     Not only does this unnecessary therapy increase Guardian's Medicaid funding through the resulting increase in CMI, but Guardian was and is reimbursed by Medicare Part B for the therapy itself.

### (ii) Medicaid Reporting Requirements

70.     Each quarter, all skilled nursing facilities are required to submit a CMI report to their State's Department of Welfare ("Department") which must include resident assessment data for every Medicaid and every non-Medicaid resident included in the census of the nursing facility on the picture date. All Pennsylvania SNFs are required to submit a CMI report to the

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Pennsylvania Department of Welfare.

71.     The Medicaid facility's resident data reporting requirements are linked closely to the federal requirements for completion and submission of MDS[14], described above. Pennsylvania has designated a document, the PA Specific MDS 3.0, which contains Section A – Q, S, V, X and Z of the MDS 3.0.   Manual § 2.1.   Each SNF must ensure that the federally approved PA Specific MDS 3.0 data for each resident accurately describes the resident's condition, as documented in the resident's clinical records maintained by the nursing facility. Pa. Code § 1187.33

72.     The SNF nursing facility must correct and verify that the information in the quarterly CMI report is accurate for the picture date and must sign and submit the CMI report to the Department postmarked no later than 5 business days after the 15th day of the third month of the quarter.  Pa. Code § 1187.33; Manual § 4.5.

73.     The PA Specific MDS 3.0 requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.   I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."

---

[14] Unlike Pennsylvania, which has adopted its own state-specific MDS, Ohio and West Virginia use the federal MDS 3.0.  *See* Ohio Department of Health at https://www.odh.ohio.gov/odhprograms/io/mds/mds1.aspx., and West Virginia Department of Health and Human Resources instructions at http://www.dhhr.wv.gov/bms/Provider/LTC/Documents/Case_MixClassificationWorkbook.pdf.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

## V.     GUARDIAN HIERARCHY

74.     Guardian operates 28 skilled nursing facilities ("SNF"), or which 23 are in Pennsylvania, four in Ohio, and one in West Virginia[15].  Each facility has a rehabilitation unit.

75.     Specifically, the Guardian Defendants operate the following facilities: Beaver Elder Care and Rehabilitation Center ("Beaver"), Belle Haven Skilled Nursing and Rehabilitation Center ("Belle Haven"), Brookline Manor and Rehabilitative Services ("Brookline"),  Carleton Senior Care and Rehabilitation Center ("Carleton"), Darway Elder Care Rehabilitation Center ("Darway"), Epworth Manor ("Epworth"), Forest Park Health Center ("Forest Park"), Guardian Elder Care Center ("GECC"), Highland View Health Care ("Highland View"), Highlands Care Center ("Highlands"), Jefferson Hills Manor ("Jefferson Hills"), Lakeview Senior Care and Living Center ("Lakeview"), Meadow View Senior Living Center ("Meadow View"), Milford Senior Care and Rehabilitation Center ("Milford"),  Mountain Top Senior Care and Rehabilitation Center ("Mountain Top"), Mulberry Square Elder Care & Rehabilitation ("Mulberry Square"), Park Center Health Care and Rehabilitation ("Park Center"), Richfield Senior Living and Rehab Center ("Richfield"), Ridgeview Elder Care Rehabilitation Center ("Ridgeview"), Rolling Hills Manor ("Rolling Hill"), Scenery Hill Manor, Inc. ("Scenery Hill"), Scottdale Manor Rehab Center ("Scottdale"), Weatherwood Nursing Home and Rehabilitation Center ("Weatherwood") in Pennsylvania, Eastland Health Care & Rehabilitation Center ("Eastand"), Ivy Woods Manor ("Ivy Woods"), Lost Creek Health Care & Rehabilitation Center ("Lost Creek"), Minerva Convalescent Center ("Minerva") in Ohio,  and Peterson Rehabilitation Hospital & Geriatric Center ("Peterson") in West Virginia.  *See* Exhibit A for the physical locations and bed counts for each facility.

---

[15] Guardian also operates two non-SNF facilities in PA: Bradyview Manor, LLC and Marion Manor, Inc.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

76.     Each of these SNFs is owned by The Guardian Defendants and their board members.[16]

77.     The Guardian Defendants manage and direct the actions of each of these SNFs through Guardian policies and procedures and the active participation of Guardian Management. Even though each facility is staffed by Guardian Elder Care and Guardian Rehab employees, Guardian Rehab employees are subject to both, Guardian Rehab and Guardian Elder Care personnel policies and procedures.

78.     Guardian Rehab employees are required to follow Guardian Elder Care's "Triple Check" policy for all Medicare Part A and Managed Medicare (requiring RUGS) billing.  The Triple Check policy applies to all Guardian Elder Care Nursing Facilities and establishes the process of review for all claims.  Under the Triple Check policy, the Guardian Rehab's MDS Coordinator, Rehab Manager, Business Office Manager and Administrator are required to review all Medicare claims before they are submitted for billing by Guardian Elder Care.

79.     In another example of Guardian corporate control, Guardian Rehab employees, including Relators, receive 401K benefits from Guardian Elder Care, LLC.

80.     Additionally, personnel records for Guardian Rehab employees, including Relators, are maintained in the corporate offices of Guardian Elder Care, referred to as "the Home Office" or simply "Corporate."  Similarly, Guardian Rehab's personnel handbook dictates the locations of Federal Labor Law posters in each SNF.

81.     Moreover, as an established practice, Relators Krauss and White were supervised by both Guardian Rehab and Guardian Elder Care personnel.  They reported and took instructions from Guardian Elder Care supervisors, including Director of Nursing Mary Shrader,

---

[16] *See* U.S. Department of Health records at www.nursinghomereports.org

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Nursing Home Administrator Ann Marie Boyne-Stauffer, Registered Nurse Assessment Coordinator Deb Hockenberry, and Manager of all Guardian Nurse Assessment Coordinators Theresa Toth.  Both Relators also reported to Regional Director for Guardian Rehab Erica Daub and Guardian Rehab Executive Director Rhonda Gallagher.

82.    For example, all Rehab Managers are required to submit weekly reports to Guardian Management detailing budgeted and actual RUG levels, length of stay, Part B units, ADL and CMI.  All Rehab Managers are also required to attend Guardian Quarterly training meetings.

83.    As explained in detail below, the three Guardian Rehab Regional Directors oversaw all Guardian Rehab facilities in Eastern, Central and Western regions, including PA, OH and WV.  Executive Rehab Director Rhonda Gallagher supervised these Regional Rehab Directors and reported to Guardian Elder Care President and CEO Eddy Inzana.

84.    During the Relevant Period, Forest Park was under the management of the following individuals:

a.    Robert Barnes ("Barnes") was a Regional Director of Operations ("RDO") for Guardian Elder Care and in that capacity oversaw Guardian facilities in Central and Eastern Pennsylvania, including Forest Park; in April of 2013, Barnes was promoted to the position of Senior Vice President of Operations for Guardian Elder Care. Barnes reported to the Senior Guardian Elder Care management.

b.    Theresa Toth ("Toth") was employed by Guardian Elder Care as a Clinical Reimbursement Manager and Manager of all Guardian Registered Nurse

FILED UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)

Assessment Coordinators, including those working at the Forest Park facility.  Toth reported to the Senior Guardian Elder Care Management.

c.   Ann Marie Boyne-Stauffer ("Boyne-Stauffer") was a Nursing Home Administrator ("NHA") of Guardian Elder Care at the Forest Park Facility.  Boyne-Stauffer reported directly to Bob Barnes.  In April 2013 Boyne-Stauffer replaced Barnes as Regional Director of Operations.

d.   Mary Shrader ("Shrader") was an employee of Guardian Elder Care and initially served as Director of Nursing ("DON") for the Forest Park facility, reporting directly to NHA Boyne-Stauffer.  In April 2013 Shrader transitioned to the role of NHA when Boyne-Stauffer replaced Barnes as Regional Director.  All Forest Park staff, including Sue Ellen Miller, RN and later DON Stephanie Cornwall, RN and RNAC Deb Hockenberry reported to Shrader.

e.   Rhonda Gallagher ("Gallagher") was employed as Guardian Rehab Executive Director, overseeing all operations and the human resources department of Guardian Rehab, as well as supervising all Guardian Regional Directors, including Daub, Dutton, Civitello and Ardire. Gallagher reported to Guardian Elder Care President & CEO Eddy Inzana.

f.   Erica Daub ("Daub") is a Regional Director for Guardian Rehab and oversees the rehabilitation services in the Eastern Pennsylvania facilities, including among others the Forest Park, Brookline, Epworth, GECC, Richfield, Rolling Hills, Weatherwood, Mountain Top, Belle Haven. White and Krauss reported to Daub through the Monday Morning Reports,

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

meetings, trainings, CMI workbook reports, phone and/or email.   After
Regional Director Patricia Dutton left in 2013, Daub began overseeing
additional facilities that were previously overseen by Dutton.

g.      Mike Civitello ("Civitello") is a Regional Director for Guardian Rehab
and oversees the rehabilitation services for facilities located in the Western
region, which includes Western Pennsylvania, Ohio and West Virginia.

h.      Deb Ardire ("Ardire") was a Regional Director of Clinical Services for
Guardian Rehab and oversaw the provision of clinical services at Guardian
facilities located in Central Pennsylvania.

i.      Deb Hockenberry ("Hockenberry") is a Registered Nurse Assessment
Coordinator ("RNAC") of Guardian Elder Care in the Forest Park facility.
Hockenberry reported to Toth, Shrader and Boyne-Stauffer.

## VI.      ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS

### A.      Guardian Systematically Pressures Its Rehabilitation Therapists to Meet Corporate Ultra High Targets and Length of Stay Targets in Order to Maximize Its Medicare Revenue

85.      Nationwide, the average percentage of Ultra High or RU patients in SNFs for
2014 was 60.9%.  Because Medicare pays significantly more money for RU beneficiaries than
for beneficiaries at lower RUG levels, Guardian aggressively pushes its staff and therapists to get
as many of its Medicare beneficiaries into the RU RUG level as possible, and to maintain them at
the RU level for as long as possible.   Guardian Elder Care accomplished this by setting and
enforcing an aggressive target of 85% of Medicare rehabilitation days its facilities had to bill at
the RU RUG level, with little regard to the individualized needs of its Medicare patients.   At the
beginning of 2014, Guardian changed its target for RU RUG levels to 79.8% for Medicare while

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Managed Care stayed at 85%.  Both target therapy levels were well in excess of the national average.  Guardian Elder Care enforces these RU targets at every level of its corporate hierarchy and rewards members of management who attained this goal.  In November of 2012, the Office of the Inspector General issued a report[17] that indicated that for 2009, 20.3% of "claims billed by SNFs had higher paying RUGs than were appropriate."  According to the report, "[i]n these cases, the SNFs upcoded the RUGs on the claims.  For approximately half of these claims, SNFs billed for ultrahigh therapy RUGs when they should have billed for lower levels of therapy or nontherapy RUGs."

86.     Guardian communicates its aggressive financial goals at regional training meetings, through training materials provided to all therapy managers, including Relators Krauss and White.  For example, training materials provided at October 22, 2013 meeting directed managers to "[s]et RUH [Ultra High] levels for 6 days of PT [physical therapy] for skilled residents" at the start of care for each patient.  This information was presented as being beneficial to a patient deserving the highest level of therapy for all six days.  This instruction also meant that managers were directed to set the Ultra High RUG levels regardless of the evaluating therapist's findings at the time of evaluation.  Similarly, the same training material instructed managers to "[a]djust PT minutes to maintain RUH for admission assessment."  The 85% benchmark for Ultra High RUG level was set by the Guardian Management and communicated to the Guardian SNFs by its Regional Rehab Directors.  Daub, who was overseeing various facilities in Pennsylvania, including Forest Park, Nursing Home Administrator Boyne-Stauffer and RNAC Hockenberry communicated the benchmarks to Relators and therapists at Forest Park.  Boyne-Stauffer was under the direction of Barnes, the Guardian Regional Director of

---

[17] https://oig.hhs.gov/oei/reports/oei-02-09-00200.pdf

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Operations, and Hockenberry was under the direction of Toth, Clinical Reimbursement Manager for Guardian.

87.     Guardian Rehab Managers, including Relators Krauss and White, were required to submit a weekly report that tracked actual versus budgeted benchmarks for Medicare Part A and B, Managed Care, and RUG level data. For example, Forest Park's January, February, and March 2014 reports show RU RUG level benchmarks of 79.80% for Medicare Part A beneficiaries and a 85% RU target for Managed Care.  Guardian also set separate benchmarks for the lower therapy levels as shown in the chart below:

| RUG | Medicare | Managed Care |
|-----|----------|--------------|
| Level | Budget | Budget |
| RU | 79.8% | 85% |
| RV | 10.6% | 10.0% |
| RH | 4.3% | 5.0% |
| RM | 5.3% | 0.0% |
| RL | 0.0% | 0.0% |

88.     Both Relators observed that all patients admitted for rehabilitation were automatically set at an Ultra High ("RU") RUG level.  The same practice of assigning a RU RUG level existed for long term care residents after a three night hospital stay that triggered Medicare Part A coverage, upon return to the SNF.  Barnes, the Guardian Regional Operations Manager; Daub, Regional Rehab Director; Toth, Clinical Reimbursement Manager and Manager of all Guardian RNACs; Rhonda Gallagher, Guardian Rehab Executive Director; Boyne-Stauffer, Forest Park Nursing Home Administrator and later Guardian's Regional Director of Operations, and RNAC Hockenberry, directly and indirectly instructed Relators to set an RU level upon admission or readmission of patients for rehabilitation.

89.     Guardian monitored the therapy provided to patients and the resulting RUG levels through the use of the RehabOptima software system.  This software system provides "real-time

28

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

access to key performance metrics" by generating more than 100 standard reports, which provide "a more detailed, granular look at operations across locations."   Consistent with Guardian's default of placing new admissions and readmissions in the highest therapy level, managers were instructed to always select an RU level of therapy in the pre-set RehabOptima template for each newly admitted or readmitted patient.   Guardian established procedures for calculating RUG utilization using the Rehab Optima Report called "RUG Utilization Report."   As an example, in its January 1, 2013 procedures, Guardian instructed Rehab Managers to give an "explanation of missed benchmark and an immediate action plan."   This and other missed benchmark reports had to be compiled and submitted weekly and also sent to the Executive Director and the Regional Director each Monday by noon.

90.     In order to increase its therapy minutes, Guardian also instructed Rehab Managers to include equipment and modalities while performing physical and occupational therapy. Guardian pays monthly fees to Accelerated Care Plus ("ACP") for providing stationary bikes and stepper machines as well as modalities, such as electrical stimulation and ultrasound.   Guardian instructed its therapists to use the ACP modalities and other equipment with any patient, in order to increase minutes and units of therapy billed to Medicare Part A and Part B beneficiaries, and to offset Guardian lease cost for the equipment and modalities.

91.     "Average length of stay" refers to the average number of days that a facility's beneficiaries stayed at the facility while covered under Medicare Part A benefit.   As described above, Medicare pays nursing facilities per patient, per day.   Guardian pressured Relators and their staff to extend their Medicare beneficiaries' stays in Guardian facilities to maximize Medicare revenue.   This practice ignored patient needs and sometimes resulted in beneficiaries unnecessarily exhausting all 100 days of their Medicare SNF benefit (leaving beneficiaries with

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

no Medicare Part A coverage for at least 60 days after the initial coverage, even if the beneficiaries later needed skilled nursing or rehabilitation care).  As with its Ultra High RUG targets, Guardian pushed its average length of stay targets at every level of the corporate hierarchy.  Nationally, only 7.5% of all Medicare Part A courses of treatment were greater than 90 days in 2014.  However, the training materials provided to both Relators and other managers of Guardian facilities at regional training meetings emphasized the goal of full "Us[age] of 100 days of Medicare benefit."

92.     For example, according to Relator White, in the winter of 2013-2014 Guardian pressured Forest Park's therapists to keep *Patient 1*, *Patient 2*, and *Patient 3* on therapy that was not medically necessary and appropriate for them until they exhausted their 100 days of Medicare Part A benefit.

93.     These corporate pressures caused Guardian therapists to provide excessive amounts of therapy that were not medically reasonable or necessary, and to extend patient stays beyond the period needed for their rehabilitations.  Because corporate targets were based in part on providing a specific number of therapy minutes per Medicare patient, therapists often did not develop individualized plans of care for patients.   In addition, corporate pressure caused Guardian therapists to provide services that did not qualify as skilled rehabilitation therapy simply to meet the ever-increasing demands of higher RU targets and longer average stays.  For example, unskilled services such as repositioning patients in bed, putting patients on a bedpan, and supervising patients' walks were provided to *Patient 1* (in winter 2013-14), *Patient 4* (in spring 2012), *Patient 5* (in January 2014), *Patient 6* (in October-November 2012 and late spring 2014) and *Patient 7* (in late 2012 and early 2013) as fully described below.

94.     Given the importance of therapy minutes to its beneficiaries' RUG levels and

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

therefore its Medicare revenue, Guardian closely monitored and managed the therapy productivity levels of its facilities and its rehabilitation therapists.   Guardian's productivity benchmark was set at 83%.

95.     Guardian generated numerous reports, including Weekly Reports submitted on Mondays that closely tracked, among other things, its facilities' RU percentages, average length of stay, therapy Part B units, ADL[18] levels, patient count and the productivity levels of its facilities.   Specifically, in the Weekly Report prepared each week by Relators as Forest Park Rehab Managers, if the benchmarks for RUG levels or units were not met, Relators were required to e-mail their Regional Rehab Director Daub explaining the reasons for not meeting the set criteria.   Weekly RUG Level reports tracked budgeted and actual levels of therapy by RUG level.   By way of example, in January 2014, Forest Park was not reaching Guardian's set benchmarks of Ultra High therapy levels and was under constant pressure to exceed required benchmarks in February to compensate for missed benchmarks.

96.     Guardian also utilized daily meetings to monitor and increase its facilities' RU percentages, average length of stay, ADL level of nursing assistance, Part B units benchmarks, CMI, and productivity of its facilities without regard to medical necessity and patients' clinical needs.   As Rehab Managers at the Forest Park Facility, Krauss and White participated in daily report meetings with the Guardian Rehab and Guardian Elder Care administration, including Hockenberry, Boyne-Stauffer, and Shrader, the nursing staff, and a representative of the business office, Kristy Scott.

97.     The first of these daily meetings, called Morning Meetings, were typically held

---

[18] ADL benchmarks were set for nursing by MDS coordinators, like Hockenberry.  ADL benchmarks were discussed at all meetings attended by Relators, where RUG benchmarks were also discussed.

FILED UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)

daily between 9:00 a.m. and 10:00 a.m., and were attended by Krauss (in 2012), White (in 2013-2014), Boyne-Stauffer (NHA), Hockenberry (RNAC and MDS Co-Coordinator), Shrader (DON), Stephanie Cornwall (ADON), as well as representatives from the business office, admissions, social services and the clinical staff.  Corporate goals and directives were communicated to the staff and any patients not meeting these goals, specifically those patients not treated at Ultra High levels, were discussed at these Morning Meetings.

98.     Morning Meetings were followed by Daily Projections Meetings.  These meetings were held in a conference room and typically attended by Hockenberry as RNAC, Shrader when she had taken the role as NHA, Toth as Reimbursement Manager, (when she was on-site), as well as Rehab Managers Krauss (in 2012) and White (in 2013-2014).  Patient counts, therapy minutes, and projections for RU percentages were reviewed during Daily Projection Meetings, with pressure placed on Rehab Managers to achieve high corporate financial targets.  Like the Morning Meetings, the Daily Projections Meetings discussed each patient not treated at Ultra High Rehab and high ADL levels and Rehab Managers were instructed to achieve Ultra High Rehab and high ADL levels, without regard to medical necessity.

99.     Relators Krauss and White also attended weekly Plan of Care (POC) Rehab Team Meetings to discuss all patients' therapy progress, discharge planning, and to communicate management's directives regarding benchmarks to the therapists.  These POC Rehab Team Meetings were held in the gym or rehab office at lunchtime, usually from 12:00 p.m. to 1:00 p.m. on Mondays.  Post meetings, if management goals were not met, Relators were ordered to contact their regional managers.  Regional Managers would then review patients' charts, and make up reasons for why patients could not be discharged, have the therapy minutes decreased, or their therapy disciplines discontinued.  Guardian Management was giving Relators Krauss and

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

White orders regarding therapy caseloads as yet another means of reinforcing corporate goals.

100.    In addition, Erica Daub, Regional Director for Guardian Rehab, mandated weekly "benchmark conference calls" for any facilities in her region (Brookline, Epworth, Forest Park, GECC, Richfield, Rolling Hills, Weatherwood, Bell Haven, Mountain Top and others) that were not reaching established benchmarks.  These calls were held anytime any of her facilities were failing to meet established benchmarks for CMI, RUG levels, and other metrics needed to achieve corporate goals.  The facilities not meeting benchmarks, including Forest Park, Brookline and others, were identified on these calls, made to feel embarrassed for underperforming, and given advice from other facilities for improving performance.  Daub herself would then instruct Rehab Managers from failing facilities, including Relators, to increase the minutes of therapy by any means possible to achieve the targets.

101.    For example, in spring or early summer 2013, in an email to representatives from each of her facilities, Daub outlined the requirements for these "benchmark" calls.  Each facility was required to report the percentage of Medicare Part A patients who were being treated at RU level, and those facilities that were below the RU percentage benchmark were required to go through and discuss all Medicare Part A patients on their caseloads and identify strategies to meet the established high benchmarks.  Daub required all Rehab Managers whose facilities were "below RUG Benchmarks" to "[b]e prepared to discuss Med A's on caseload and [to] know their current LOS [Length of Stay]."  The Forest Park facility was below the benchmark at that time.

102.    In addition, Relators participated in regular patient caseload meetings to discuss patients who were not at the Guardian's desired RUG, CMI, ADL or therapy unit levels.

103.    Guardian also held Quarterly Managers' Meetings in DuBois, Pennsylvania.  These meetings were attended by the Rehab Managers from each of the Guardian facilities, as

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

well as all of the Regional Rehab Directors, including Erica Daub, Patricia Dutton, Deb Ardire

and Mike Civitello.  Executive Director of Guardian Rehabilitation, Rhonda Gallagher, and a

human resources representative from Guardian Rehab also attended these Quarterly meetings.

104.    Each facility was required to send its Rehab Manager and one therapist to these

Quarterly Manager's Meetings in DuBois.  Relator Krauss attended meetings on June 5, 2012

with the Forest Park therapist Erin Lehman, on September 19, 2015 with the therapist Tiffany

Kilmer and in December of 2012 with the therapist Ashley Ayers.  The meetings were held at the

Fort Worth Restaurant and the Lakeview Lodge.  Relator White attended several of the Quarterly

Meetings, including a meeting on October 22, 2013 with Tiffany Kilmer and on April 23, 2014

with Keith Sorg.  These meetings were held at the Guardian Corporate offices in Brockway and

at the Lakeview Lodge.

105.    During these quarterly meetings, Guardian distributed training materials to

Relators and other Rehab Managers, which were designed to reinforce Guardian's targets and

benchmarks.   Moreover, at these company-wide Quarterly Manager's Meetings, Guardian

publicly announced the names of Guardian facilities that met corporate goals and those that did

not.  Managers of facilities, including Relators at Forest Park, Brookline and others were made to

feel embarrassed and underperforming for not meeting corporate goals.

106.    As a result of Guardian's constant pressure and directions given to Relators and

their staff, many Medicare Part A patients were subjected to rehabilitative therapy that was

medically unreasonable, unnecessary, unskilled and possibly harmful.

107.    For example, the Monday Morning Report for Forest Park facility for a week in

February of 2014 notes that *Patient 8* was dying.  Nevertheless, to achieve an RU RUG level, he

was treated with all three therapy disciplines in an attempt to get minutes to sustain the RU RUG

34

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

level.  The report further shows that the patient passed away six days after being admitted for therapy.

108.    *Patient 4* was in the end stages of his life in the spring of 2012.  He was in and out of the hospital, with significant episodes of respiratory distress, and refused all therapy. Regardless, in April of 2012, therapists were instructed to provide medically unnecessary and non-skilled treatment, such as changing his position, putting him on a bedpan, stretching his legs, and moving him, just to keep him on the caseload and maintain an RU RUG level.  During a Morning Meeting in May of 2012, Relator Krauss reported that *Patient* 4 was dying and refusing therapy, but she was instructed by Boyne-Stauffer to put the patient on a stationary bike so that Guardian could get the required minutes of therapy to support his RU RUG level.  This patient continued to be treated at an Ultra High level for approximately a month and died shortly thereafter.

109.    In April of 2014, *Patient 9* was medically declining, and cognitively unstable following multiple strokes.  After a surgery, the patient was admitted for therapy under Medicare Part A.  According to Relator White, therapy was neither medically necessary nor beneficial for *Patient 9*.  Moreover, this patient did not want therapy due to pain in his right lower extremities and was not cooperative.  Nevertheless, multiple modalities of therapy were used to get the necessary minutes to support an RU RUG level.  *Patient 9* died while on therapy.

110.    *Patient 10* was terminally ill.  The patient had a brain tumor and was on an experimental chemotherapy drug, but was not improving.  In August of 2013 the patient asked to go home on hospice, but was not allowed by Guardian.  Based on the patient's diagnosis and tolerance for therapy, RU level therapy was not medically necessary or beneficial.  Nevertheless, based on instructions from Guardian Management, *Patient 10* was on speech, physical, and

FILED UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)

occupational therapies with an RU RUG level at the time of his death.

111.   *Patient 7* had severe dementia.   The patient fractured a hip in early 2013, and returned to the SNF after a three day hospital admission under Medicare Part A.   It soon became evident that the patient was regressing and should be on hospice.   Therapists informed Guardian administrators that *Patient 7* was no longer appropriate for therapy and should instead be placed on hospice.   Nevertheless, therapists were instructed to keep the patient on caseload and to provide therapy.   Therapists were instructed to move the patient's limbs and reposition the patient in bed to obtain therapy minutes.   *Patient 7* died while still on therapy.   If the patient had been discharged from therapy, the patient would have been covered by a lower Medicaid rate, as opposed to the higher Medicare Part A rehabilitation rate.

112.   *Patient 11* was extremely ill.   Although this patient did not want or need therapy, the patient was treated at an RU level, despite Relator White's notes from a meeting on July 25, 2013, that the patient was "medically not good."   As evidenced from the meeting notes, Guardian's goal was to keep *Patient 11* at RU level for the next assessment date, but the patient died one day prior to the assessment date.

113.   *Patient 12* was on dialysis, as a long term care resident. Following hospitalization in February of 2014, he came back to the SNF as a Medicare Part A patient.   Therapists from all three therapy disciplines were instructed to "pick up" *Patient 12* for therapy to reach the target RUG level.   *Patient 12* stated repeatedly that he did not want therapy and that the therapy was being forced on him.   He was uncooperative throughout treatment and no progress was made. As discussed below, after the completion of his stay under Medicare Part A, *Patient 12* was subsequently "picked up" for more unwanted and unnecessary therapy to artificially increase CMI, which is another revenue target for Guardian.

36

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

114.    *Patient 13* was terminally ill, but was given all three therapy disciplines at bedside, to obtain an RU RUG level by the middle of July of 2013, as evidenced from Relator White's Meeting notes.   This patient passed away several days before the patient's next assessment in the summer of 2013.

115.    In another effort to maximize reimbursement, Guardian set up an 80% benchmark for ADL B and C levels for all Medicare Part A patients.   MDS coordinators and nurses were instructed to achieve this high ADL benchmark.   As described in section (ii) above, a patient's ADL score (ranging  from A to C) reflects his or her dependency level when performing the activities of daily living.   A very dependent  patient, who cannot perform any of the ADLs without assistance, would generally receive an  ADL score of "C," while a patient who could perform the ADLs without assistance would receive an ADL score of "A."

116.    The ADL scores were reported at daily and weekly meetings at Forest Park that Relators attended.  If a patient was assigned an "A" ADL level, Deb Hockenberry was instructed by Theresa Toth to review the patient's chart in order to find any information that would allow her to change the patient's assigned level of assistance to a higher B or C level, disregarding the patient's needs.   As Rehab Managers, Relators were often asked to educate Certified Nursing Assistants (CNAs) on how to assist a patient in the bathroom or with bed mobility.  CNAs were instructed to find unnecessary ways of assisting patients who had already reached independence, like helping them out of bed, in order to assign "extensive assist" level C.  This higher level of assistance was presented as a matter of patient safety, but only served to increase Guardian revenue.

117.    For example, Relator Krauss told Guardian Management in November of 2013, and again in December of 2013, that *Patient 14* was getting out of bed and walking without

37

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

assistance.  Despite Krauss' report, *Patient 14* was assigned an assistance needing ADL level of B or C.  In another example, Relator White noted in her daily meeting notes in August of 2013, that *Patient 15*, who did not need assistance, was being "pull[ed] up in bed" in order to achieve a higher ADL level B.

> **B.      Guardian Manipulated the Minutes of Billed Therapy to Maximize Reimbursement Without Regard To Medical Necessity**

118.    Guardian also manipulated the minutes billed for therapy to maximize the company's profits without regard to the patient's medical needs.  The training materials distributed to all Rehabilitation Managers, including Relators White and Krauss at Quarterly Managers' Meeting on October 22, 2013, stated Guardian's strategies with respect to therapy:

- Therapists understand they need to get posted minutes

- Therapists communicate **if over or under minutes to [Rehab Director] or back up manager**

- **Teamwork to adjust minutes to keep RUG**

- **Adjust PT minutes to maintain RUH for admission assessment**

- Sometimes need to reassure staff that they should bill for attempts made, education to patients and staff

- Sometimes need to reassure nursing that we can adjust our treatment approach when patient not feeling well.

119.    Consistent with this strategy, Guardian pressured Relators and their staff to provide only the minimum amount of therapy necessary to achieve the highest RUG level possible, rather than basing it on the medical needs of the patient, as required by CMS guidance. For example, if it did not seem possible to reach an RU RUG level requiring 720 minutes of therapy, Relators and their staff were pressured to drastically reduce therapy minutes so as not to exceed the 500 minimum minutes necessary to obtain the lower RV RUG level.

FILED UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)

120.    Once a patient reaches a specific RUG level, additional minutes of therapy beyond the set minute threshold (*i.e.* 720 min. for Ultra High, etc.) do not result in any increase in Medicare payments.  As a result, Guardian actively policed therapy "overages" in excess of RUG level thresholds.  Guardian's instructions to avoid "overages" are contrary to the CMS guidance that "[a]ll of the groups were created based on a continuum of minutes being provided, including Ultra High.  Just as we expect to see beneficiaries in the High Rehabilitation [with 325 minutes minimum threshold] sub-category receiving 450 minutes per week, we expect that as many minutes as are needed will be provided to beneficiaries in the Ultra High groups."  64 Fed. Reg. at 41,663.   The CMS guidance made it clear that the RUG threshold minutes are "minimums and are not to be used as upper limits for service provision."  *Id*.

121.    When Relator Krauss was a Guardian Rehab Manager for Forest Park, Guardian only allowed 10 minute "overage" above any RUG level; later, when Relator White became Forest Park's Rehab Manager, Guardian instructed its staff to avoid any "overage" above the minimum threshold of therapy minutes for each level of RUGs, regardless of the patients' medical needs.

122.    Similarly, if a patient missed the necessary therapy time by five or ten minutes and triggered a change of therapy ("COT") to a lower level, Relators weretold by Daub and Boyne-Stauffer to find therapists who could add extra minutes and avoid a COT. Daub, Boyne Stauffer, Hockenberry and Toth told Relators Krauss and White that COTs were unacceptable unless they were used to increase therapy levels.

123.    RNAC Hockenberry told Relators Kraus and White that it was unacceptable to assess a COT if it resulted in a decrease of RUG levels.  Hockenberry stated that any such COTs needed to be "fixed immediately."    For example, on April 9, 2014, in order to eliminate the

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

need for a COT assessment that would result in decreasing the patient's therapy level from RU to RV, Hockenberry texted Relator White: "*Patient 16* is an RV for his 5 day of [redacted], he missed [RU] by 25 min, this needs to be fixed ASAP."  Minutes were subsequently added to increase the patient's RUG level to RU. In another example, when therapists were not able to adjust the minutes to increase therapy level to Ultra High, Guardian Elder Care Nursing Home Administrator Shrader texted Relator White on February 12, 2014: "I am concerned that what we discussed doing with [*Patient 2*]  did not occur (missed COT to RU on 2/15)."  Again, under pressure and directions from the Guardian administration, Relators were told to ask the therapy staff to add minutes that they "forgot" to bill.

124.    The Relators were also instructed to arbitrarily adjust minutes between disciplines to ensure maximum reimbursement levels.  For example, if speech therapy discharged a patient, the minutes of physical and/or occupational therapy would increase in the subsequent days by an equivalent amount to ensure the RUG level was maintained.  This widespread and standardized Guardian practice was based on reimbursement level and not on patients' medical necessity or individualized plan of care.  Therapists at Guardian were instructed to only bill 15 minutes for every evaluation, regardless of how long it took to complete.  According to Relators White and Krauss, any time spent with a patient over the allotted 15 minutes was billed and is continued to be billed as treatment, regardless of the accurate CPT coding.  For example, in the 2012-2013 evaluations of *Patient 14, Patient 12, Patient 7, Patient 9* and others, were billed as therapy treatment after the first 15 minutes.

125.    Medicare does not allow evaluation minutes to be counted towards the RUG level.  Therefore, by reassigning these evaluation minutes incorrectly to a therapy code, Guardian increased the level of minutes achieved at the 5 day assessment.  The minutes reported at the 5

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

day assessment thus are incorrect because they are artificially inflated to include evaluation minutes.

126.    In another way of maximizing their profits, Guardian directed therapists to expect ACP modalities to be part of the treatment, as a "[g]reat way to maximize minutes when activity tolerance is poor."

127.    For example, medically declining *Patient 4 and Patient 9* were put on multiple modalities of therapy (in spring 2012 and April of 2014, respectively) to get the necessary minutes to support an RU RUG level, as described in detail above.  Also, according to Relator White, long term care residents *Patient 17* and *Patient 18* did not need or want therapy. Regardless, in March and April of 2014, ACP modalities were used to treat these patients at RV level.  This therapy was not skilled.

### C.    Guardian Systematically Pressures its Staff to Meet Unit of Therapy Benchmarks in Order to Maximize its Medicare Part B Revenue.

128.    Medicare pays SNFs for therapy to its Part B beneficiaries based on a number of therapy units.  In order to maximize the number of therapy units Guardian bills under Medicare Part B, Guardian sets therapy unit targets for its facilities that are unrelated to patients' actual conditions, diagnoses, or needs.  In 2014, Guardian set the total weekly target for physical, occupational, and speech therapy at Forest Park at 355 units per week: 175 units per week for physical therapy, 145 units per week for occupational therapy, and 35 units per week for speech therapy.

129.    In order to monitor and enforce its targets, Guardian requires its Rehab Managers to submit weekly reports, including Weekly Part B reports that detail the budgeted and actual units of physical, occupational, and speech therapy, as well as budgeted and actual ACP modalities' and productivity benchmarks.

41

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

130.    If Rehab Managers, including Relators, missed the benchmark for one therapy discipline, they were instructed to make up the missed benchmark by upping the minutes in another therapy discipline, in order to meet the budgeted number of units.  For example, if a patient was discharged from speech therapy, the minutes of physical or occupational therapy would increase in the subsequent days or weeks to compensate for the "lost" minutes of speech therapy.  Guardian's Weekly Part B report monitors its facilities' performance in meeting corporate targets by tracking budgeted, actual, and "over [and] under" units.  For example, Forest Park's Weekly Part B Report for the first week in January of 2014 shows the facility was 35 units short of Guardian's weekly unit target.  In the second week of January, after increased pressure from Guardian, the facility exceeded its weekly target by 34 units to compensate for the missed benchmark of the previous week.  Under Guardian's constant pressure, Forest Park also met its average weekly unit target in the months of February, March, April, May, and June of 2014.  Guardian did not set an "overage" limit on therapy units.

131.    Additionally, due to Medicare Part B unit targets for Guardian Elder Care and Guardian Rehab, Rehab Managers were required to report the number of patients on caseload on a daily basis.  To achieve these Medicare Part B targets, Rehab Managers were instructed by Nursing Home Administrators and Rehabilitation Regional Directors, including Boyne-Stauffer and Daub, to immediately pick up a patient to replace anyone discharged from their caseload.

132.    As an example, in its January 1, 2013 procedures, Guardian instructed Rehab Managers to calculate Medicare Part B utilization using the Rehab Optima Report called "Service Code Usage Report" and to give an "explanation of missed benchmark and an immediate action plan."  The Report had to be compiled and submitted weekly and also sent to the Executive Director and the Regional Director each Monday by noon.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

133.     As described in Sections A, B, and D, Guardian held daily and weekly meetings and conference calls in order to communicate, monitor and enforce corporate benchmarks, including Part B therapy unit benchmarks. At these meetings and calls, Guardian communicated corporate goals and directives to the staff and discussed any patients who were not on therapy to meet these goals. As with benchmarks for RU levels, length of stay, ADL and CMI, if management goals were not met with regard to physical, occupational and speech therapy, Rehab managers, including Relators were ordered to contact their regional managers. Regional Managers would then review patients' charts, and make up reasons for why patients should be on one therapy discipline or another.  Guardian Management was giving Relators Krauss and White orders regarding therapy caseloads as yet another means of reinforcing corporate goals.

134.     Moreover, Guardian pressured Relators and their staff – after the fact – to adjust the minutes of therapy reported to achieve the desired billing level.  For example, Guardian Elder Care generated a Medicare Part B – **Missed Minutes Report**.  This is a report in the e-doc system that allows management to see if a therapist bills just under the next billing unit based on Medicare Part B eight minute rule.  For example, if a therapist bills 35 minutes, the system will flag that the therapist was three minutes short of reaching the next unit of billing.  Then Daub would instruct Rehabilitation Managers, including Krauss and White, to go back to therapists after they had already entered their therapy minutes, to ask if they had actually provided three minutes more than they billed.   Then, with the therapists' approval, Relators would be instructed to add three additional minutes to get to the higher paid unit.   If the therapists resisted the adjustments, Relator Krauss and White were instructed to educate the therapists about Guardian billing practices and to remind them to bill at least the minimum amount of minutes to enable billing of an additional unit (*i.e.* 23, 38, 53 minutes) to ensure maximum reimbursement. This

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Missed Minutes Report had to be approved by Guardian Management each month.

135.     Furthermore, in violation of Medicare Part B regulations, Guardian did not keep daily documentation to support Medicare Part B billing, and the delayed entry of minutes was not identified or supported.   According to Relators, Guardian did not have therapists maintain daily schedules to account for therapists' time.   Therefore there was no support for any change in minutes, especially those changes made up to a week after the date of service.

136.     As described in Section D, Guardian's systematic pressure to provide unnecessary therapy resulted in reimbursement from both, Medicare and Medicaid.   Medicare Part B paid Guardian for medically unnecessary and unreasonable services and Medicaid funded Guardian's SNFs inflated CMI.   For example, as detailed below, prior to the August 2013 picture date, unnecessary and excessive therapy was provided to *Patient 6, Patient 19, Patient 20, Patient 21, Patient 22, Patient 23, Patient 24, Patient 25, Patient 26, Patient 27, , Patient 28, Patient 29,* and *Patient 30*.

137.     Guardian pressured its staff to "pick up" patients who did not contribute to CMI and were not on Medicaid, but had Medicare Part B coverage, in order to meet Guardian's Medicare Part B therapy unit benchmark.   In August 2013, Forest Park patients identified as *Patient 5* and *Patient* 31 were covered by Medicare Part B benefit, and therapists were pressured to pick them up for unnecessary therapy to increase Guardian's Medicare revenue.   As a result, both patients were picked up for therapy before the next picture date.

138.     In order to maximize revenue from Medicare and Medicaid, Guardian also pressured therapists to provide therapy to patients whose Medicaid status was pending.   As soon as a patient's Medicaid status was approved, the patient's CMI value would count towards the next picture date. If no therapy was provided to these patients, their lower CMI values pulled the

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

facilities' CMI down, therefore these patients were included in calculations to meet CMI benchmarks.

139.    Guardian also instructs Rehab Managers to use ACP equipment and modalities while performing physical and occupational therapy, in order to increase minutes and units of therapy billed to Medicare Part B beneficiaries.

> **D.    Guardian Systematically Pressures Its Rehabilitation Managers and Therapists to Meet Corporate CMI Targets in Order to Maximize Its Medicaid Revenue**

140.    The Department of Health and Human Services has reported that the average CMI for Medicaid patients in Pennsylvania SNFs in 2011-2012, was ranging from 1.03 to 1.06. During the same period, the average CMI for all patients in Pennsylvania was 1.09. Nevertheless, Guardian Elder Care set and enforced an aggressive CMI target of 1.17, with little regard to the individualized needs of its Medicaid patients.  Guardian Elder Care enforced these CMI targets at every level of its corporate hierarchy and rewarded members of management who attained this goal.  Members of Guardian Management, including Hockenberry and Boyne Stouffer, indicated during numerous conversations with Relators that their bonus structure depended on achieving corporate benchmarks.  To achieve these CMI targets, Relators and their staff were routinely directed and pressured by management to "pick up" patients to therapy caseloads, and provide treatment that was not medically necessary, for at least thirty minutes per day, five days per week (total 150 minutes per week) to increase the facility's CMI.

141.    By way of example, *Patient 32* was a long term care patient covered by Medicaid. She was diagnosed with progressive dementia and had severe cognitive problems. In April of 2014, *Patient 32* fell in her room shortly before "picture day", but was not injured or in need of physical therapy as a result of the fall.  However, Hockenberry pressured Relator White to have

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

her staff add *Patient 32* to the caseload.  In a text message sent in April, 2014, Hockenberry instructed White as follows: "[*Patient 32*] fell yesterday, and must be picked up by therapy, she is CMI and it needs done ASAP, no later than the [date redacted], please respond ASAP." Noting that another Medicaid patient was potentially leaving Forest Park prior to "picture day", Hockenberry added "[W]e may not be a 1.17, we need to take this opportunity with [*Patient 32*] and get her on caseload ASAP."

142.    Shrader also contacted Relator White by text message on the same day, and directed her as follows: "[*Patient 32*] fell last night. Went to ER. No injuries. I want her picked up by PT by tom[morrow].  **She is one we needed for cmi**".

143.    As a result, the therapy staff was directed by Regional Rehab Manager Daub to evaluate and treat *Patient 32* for five days.  Consequently, billing for five days of treatment put *Patient 32* at a higher assessment level for the "picture day," thus increasing the facility's CMI. Following the assessment date, the therapy was discontinued, since there was no medical necessity to justify treatment.

144.    Guardian Management also directed Relators to add another Medicaid beneficiary, *Patient 33*, to the therapy caseload each quarter for CMI purposes.  *Patient 33* had severe dementia, continence issues, no capacity for decision making, and no sustained benefit from therapy.  However, because the patient did not resist therapy, Relators were directed to provide therapy for 30 minutes per day, five days per week.  In March 2012, July, 2013, and during winter and spring of 2014, the patient was often placed on an omnicycle in the gym to "increase[e] activity tolerance and strength."  An omnicycle can power itself and requires limited patient involvement, since it continues to move even when the patient is not actively exercising. The use of an omnicycle is a non-skilled activity that requires minimal following of a therapist's

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

instructions and was a way to increase "therapy" time without medical justification.

145.    By contrast, patients whose stay and therapy were not covered by Medicaid and Medicare Part B, but who were instead covered by a managed care plan that did not pay based on the RUG structure, were treated much differently.   Unlike Medicaid and Medicare Part B patients, who were frequently subjected to excessive, medically unnecessary treatments, patients whose  plans paid based on a flat rate[19] or other plans that capped reimbursement for therapy, frequently received far less therapy than was medically appropriate.

146.    For example, Forest Park *Patient 34*, who had suffered a stroke and a head injury, was in need of high intensity skilled therapy.  In the summer of 2013, at a regular caseload report meeting, Guardian Management instructed Relator White that *Patient 34* could be treated at no higher than a RM level, because to treat that patient at a higher level would not be profitable for Guardian.  Relator White was compelled to instruct therapists to treat *Patient 34* for no more than twenty minutes per day per discipline.

147.    On January 18, 2014, Shrader sent a series of text messages to Relator White instructing that *Patient 35* and *Patient 36* be added to therapy caseloads in advance of the February 1 "picture day".  However, once Shrader was reminded that *Patient 35* was not a Medicaid patient, and thus would not contribute to the facility's Medicaid CMI, Shrader responded "Forgot [*Patient 35*] won't count in CMI."

148.    Guardian did not pressure therapists to provide therapy to patients who did not contribute to its facilities' CMI and identified these patients in its CMI Workbooks.  Specifically, the Forest Park's CMI Workbook for August, September and October of 2013, lists patients who "Do Not Impact CMI:" *Patient 5, Patient 35, Patient 37, Patient 31, Patient 38, Patient 39,*

---

[19] Some managed care plans paid a flat rate that was the equivalent of RUG RM level of one hour per day therapy.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

*Patient 3, Patient 10, Patient 40,* and *Patient 41*.  Therapists were instructed to screen these patients every quarter, but were discouraged to provide therapy, even if it was needed.  For those patients who did not contribute to CMI and were not on Medicaid, but had Medicare Part B coverage, Guardian would pressure its staff to pick these patients up for therapy to meet Guardian's Medicare Part B therapy unit benchmark.  For example, in August of 2013, Forest Park *Patient 5* and *Patient 31* were covered by Part B and therapists were pressured to pick them up for unnecessary therapy to increase Guardian's Medicare revenue.

149.    Forest Park Rehab Managers Relator Krauss and White, in 2012 and 2013-2014 respectively, were instructed on multiple occasions by Daub, the Regional Director for Guardian Rehab, that every therapy patient whose stay was covered by Medicaid should be on one discipline each quarter so that therapy was always included in the patient's quarterly assessment. Daub directed Krauss to ensure that every therapy discipline would screen the patients each quarter, but that only one discipline would add that patient to its caseload, and the other discipline(s) should wait until later picture dates.  Daub explained this staggered strategy as being necessary to ensure that Guardian would not provide therapy that did not improve the facility's CMI.  Relator Krauss was instructed by Daub to present this systematic staggered approach to Medicaid screenings at a Rehab Managers meeting in Dubois, PA on June 5, 2012. At this time Relator Krauss had not had full training in Medicare/Medicaid Regulations, but was directed to present the information she had been given from Daub.

150.    Guardian Elder Care developed a CMI workbook and set up specialized training for how to use the CMI workbook to maximize revenue from CMI.  The training was held on July 25, 2012.  All MDS coordinators and Rehab Managers, including Relator Krauss, were required to attend.  The training was presented by Guardian Elder Care Clinical Reimbursement

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Manager Theresa Toth.   When Relator White became a Rehab Manager, she was trained

separately on the CMI workbook by Deb Hockenberry and Erica Daub.

151.    Guardian directed its therapists to approach patient treatment in this manner in

their printed training materials as well.   For example, a training material from a regional Rehab

Managers meeting on April 23, 2014, required staff to "identify target residents" losing

rehabilitation RUG levels in the System 3-CMI Workbook.   Guardian instructed every facility to

place a System 3-CMI Workbook "in a central location where all therapists have access."   Each

targeted patient was picked up for one discipline, regardless of the patient's clinical needs.

Therapists were instructed to mark off the discipline for a selected patient and "move on" to the

next targeted patient on the spreadsheet.   According to Relator Krauss, the spreadsheet

developed by Daub was always hung on the wall in the rehab office of the Forest Park facility

where Rehab Managers had to sign off on who was picked up.   Guardian maintained a CMI

workbook that showed CMI values for long term care residents, as well as patients on 30-60 day

breaks for Medicare Part A, and patients whose rehab RUG levels dropped in comparison to their

previous quarterly assessments.   Also included were needed weekly screenings.

152.    Guardian pressured Relators and other Rehab Managers to "pick up" patients with

low CMI, since adding therapy to those patients would have the biggest influence on CMI.   A

CMI workbook was used to generate the so-called "**biggest bang for the buck list,**" which

named the patients who were pulling the CMI down by not capturing a therapy RUG.   Close to

"picture day," Hockenberry gave Relators what they referred to as the "biggest bang for the buck

list," with highlighted names and asterisks next to names of patients who could most influence

the CMI if they were to receive the minimum number of therapy minutes to reach the target CMI

value.   These patients were long term care residents who did not require significant nursing

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

assistance.  Usually, they were assigned[20] a low CMI value which would lower the facilities' CMI multiplier average, resulting in a lower Medicaid reimbursement.   Adding therapy to these patients dramatically increases their CMI value calculation and they were therefore often placed on the "biggest bang for the buck list."   For example, Forest Park *Patient 42* and *Patient 43*'s CMI value (under PA1 category) was 0.48, but with the added therapy their CMI increased to 1.13.   Similarly, *Patient 27, Patient 28,* and *Patient 30*'s assigned CMI value based on their medical needs (under PE1 category) was 0.79, but with therapy it increased to 1.39.   These patients would have been on "the biggest bang for the buck list" in the summer of 2013, and they were picked up for therapy under persistent pressure from Guardian during August 2013. According to the August, September and October of 2013 CMI workbook, *Patient 42, Patient 43, Patient 27, Patient 28* and *Patient 30*, among others, were "losing Rehab CMI" again and therapists were pressured to pick up these patients for therapy for the next "picture date" without regard to medical necessity in order to achieve Guardian's inflated CMI targets.

153.    Rehab Managers were given every patient's CMI value.  Hockenberry informed Rehab Managers of the patients' quarterly/annual assessment date and the required therapy minutes.   Hockenberry would also inform Managers of each patient's potential value to the facilities' CMI.   In addition, Hockenberry informed Rehab Managers of the patients' ADL score. If a patient needed a particular level of nursing assistance, in addition to the therapy, the patient would bring a better value to the CMI calculation.   For example, Hockenberry sent Relator White text messages on January 9, 2014, demanding that the minutes of therapy for two patients be increased in order to maximize the facility's CMI, stating "[w]e need to treat *Patient 44* at High min, ADL at 13," and "[w]e need to treat *Patient* 5 at High min, ADL 13."   Relators

---

[20] CMI value for each patient was assigned based on MDS 3.0 Medicaid RUG III.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

received explicit instructions from both Hockenberry and Boyne-Stauffer to ensure that patients were on therapy on their assessment date.

154.    By way of example, a CMI workbook for August, September and October of 2013 for the Forest park facility shows every patient's CMI value, ADL score, and RUG level.  It also lists Forest Park patients who are "Losing Rehab CMI" under their current quarterly assessment.  The CMI workbook shows the budgeted CMI of 1.17 for the next picture date and states that "if no additional Rehab" patients are added, the CMI is projected to drop to 1.1.  The workbook instructs the facility to screen residents prior to picture dates and to screen residents "with low CMI."   It also instructs MDS Coordinator [Hockenberry] to "**schedule MDS to capture highest acuity**."   According to Relator White, Rehab Managers and therapists were pressured to put patients scheduled to lose Rehab therapy back on therapy by the end of the CMI quarter in October.

155.    As detailed above, Guardian also utilized regular meetings to monitor, among other things, its facilities' CMI, Medicare B caseload, in addition to RU percentages and the average length of stay.  In these daily and weekly meetings, Hockenberry and Boyne-Stauffer pressured Relators and their staff to improve the facility's CMI to include a "buffer" above the quarter's CMI benchmark, in case a patient died or left the facility, or a pending Medicaid application was approved prior to "picture day."

156.    Daub also mandated weekly "benchmark conference calls" for any facilities in her region not reaching established benchmarks including among others CMI and Medicare Part A.

157.    In addition to the regular daily and weekly meetings detailed above, management held meetings in advance of "picture day" to review patient lists and instruct therapists and

FILED UNDER SEAL

PURSUANT TO 31 U.S.C. § 3730(b)(2)

rehabilitation managers to pick up specific patients for therapy, whether or not medically necessary, in order to make the facility meet its unreasonably high CMI targets and benchmarks.

158.    For example, Forest Park administrators, including RNAC, communicated the CMI benchmarks during weekly POC Rehab Meetings and daily Projections Meetings.   In addition, special CMI meetings were held in the days immediately prior to "picture day" if the facility was not projected to make the 1.17 CMI target.

159.    Relator Krauss attended one such meeting on the morning of January 18, 2013, following the regular Morning Meeting.  This meeting was attended by Barnes, Boyne-Stauffer, Daub, and Hockenberry, with Toth participating by phone.  Krauss was informed by Daub that this meeting was called because Forest Park facility was not on target to meet the CMI benchmark for the February 1st "picture day."  Ironically, this meeting was held in the rehab office because the Department of Health and Human Services was conducting a Utilization Management Review – an audit conducted by the Department to monitor the accuracy and appropriateness of payments to nursing facilities and to determine the necessity for continued stay of residents – in the conference room where such CMI meetings were usually held.

160.    During this special CMI meeting, Guardian Elder Care's managers discussed every Medicaid patient in the building, identifying the patients' "CMI values."  Rehab Managers, including Krauss, were asked to explain why certain patients did not meet therapy targets. Specifically, Hockenberry read out patient names and the CMI values captured during the quarter, and Toth calculated the "increase [in CMI] value" if those patients not on therapy were placed on therapy.  Daub reviewed previous patient notes on the RehabOptima electronic documentation system.  Daub demanded to know why patients with a prior history of therapy did not continue with the therapy regimen.  If there was enough time before "picture day", the

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

management identified reasons to pick up patients for therapy to increase the CMI value.  If sufficient therapy could be scheduled, then a "significant change" assessment would be scheduled before "picture day", increasing the CMI.  Relator Krauss remembers a distinct comment made during this meeting about a patient in the dementia unit who had speech therapy approximately six months prior.  Daub stated "*Patient 5* will have gotten worse by now, so speech [therapist] should be able to do something with her now."

161.   Additionally, Relator White was repeatedly instructed by Daub to not use the word "screen" but to use the word "evaluation," when talking with the evaluating therapists about picking up patients for therapy to increase CMI.  The difference in terminology is more than semantic.  A "screen" involves determining whether there is any change in the patient's condition that may require an "evaluation" by a skilled therapist.  Screens are not billed and no treatment plan is established based upon a screening.  An "evaluation", on the other hand, is a billable activity.  Additionally, when a therapist is instructed to "evaluate" they are implicitly being told that management wants them to find something that requires treatment.  Put simply, if a therapist is evaluating a patient, it means a therapist already found something to evaluate.  By way of example, the following Medicaid patients from Forest Park facility were provided therapy which was not medically necessary, with the sole purpose of achieving Guardian financial targets by increasing CMI.

162.   A Medicaid beneficiary, *Patient 30* did not require therapy or skilled nursing assistance.  He was pulling the CMI down significantly.  During a January 18, 2013 meeting, Relator Krauss repeatedly stated that no therapy was needed and that the patient was refusing all therapy services.  In jest, Krauss mentioned that the patient bumped his toe on the dresser, and Barnes quickly instructed Krauss to pick up the patient for therapy on account of the toe,

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

although there was no injury, functional change, or other medical necessity for skilled services. Again, in summer 2013 and late winter/early spring 2014, *Patient 30* was pulling the CMI down and now Relator White was instructed by Daub to evaluate *Patient 30* for physical therapy needs, although the Forest Park management was well aware that skilled therapy was not needed for this patient. As a result, *Patient 30* was picked up and billed for physical therapy that in reality consisted of non-skilled therapy of observing and following the patient around the building. This allowed for the five day treatment before the assessment time to increase the facility's CMI.

163.    *Patient 45* was another patient "pulling" the CMI value down. With one exception, this patient refused all skilled therapy throughout Relator Krauss' time at Forest Park. *Patient 45*'s attending doctor would not sign orders for therapy, knowing that *Patient 45* had refused therapy. Relator Krauss relayed this information to those present at the CMI Benchmark meeting on January 18, 2013, but was instructed to find some way of getting the patient a higher CMI value. Immediately following the meeting, Daub went with Krauss to observe the patient. *Patient* 45 was eating a cracker and had a couple of crumbs left around his mouth. Seeing this, Daub informed Krauss that the patient had oral residue and needed to be picked up for speech therapy. Krauss informed Daub that *Patient 45* had already been screened by the speech therapists and that there was no need for skilled therapy. This patient had also refused all therapy. Daub nevertheless informed Krauss that she would talk directly to the Speech Therapist about evaluation for therapy. The Speech Therapist screened again and no skilled services were indicated. Regardless, *Patient 45* was then picked up for occupational therapy for the five-day assessment prior to the next picture date in order to increase the facility's CMI.

164.    *Patient 46* suffered constant chronic pain in the left shoulder. Although therapy had only a temporary benefit, the patient was picked up for therapy during CMI assessment

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

periods to increase the facility's CMI value in July of 2013, and again in the winter of 2013 and 2014.

165.    *Patient 29* suffered from severe dementia and was not cooperative. According to Relators, in the summer of 2013, therapy was not medically necessary or reasonable for this patient, but since *Patient 29* contributed to the facility's CMI, she was picked up for therapy prior to picture dates, including the August of 2013 picture date.

166.    *Patient 28* suffered from severe dementia and was not cooperative.  Therapy for this patient was not beneficial or skilled, yet Relator Krauss had this patient on her caseload for therapy in winter of 2012 and he was picked up for therapy prior to picture dates, including the August of 2013 picture date.

167.    *Patient 6* did not need or want therapy, but therapy was administered to this patient in October and November of 2012, during Relator Krauss' time and in late spring of 2014, during Relator White's time.  As soon as therapy was discontinued, *Patient 6* regressed. Regardless, the patient was continuously picked up for therapy for short periods to increase CMI.

168.    *Patient 27* had severe dementia and was not cooperative.  Therapy was not beneficial and medically necessary, but therapists were pressured to pick this patient up prior to picture dates, including in the August of 2013 picture date.  The pressure to put this patient on therapy intensified after each fall out of bed which was an attention seeking behavior and did not result in injuries.

169.    Although *Patient 26* had no need for therapy, under pressure from Guardian, the therapists repeatedly put the patient on therapy against the patient's will prior to picture dates, including the February and August of 2013 picture dates.

170.    Therapy for *Patient 25* was not indicated, but since the patient cooperated,

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Guardian repeatedly pressured therapists to put *Patient 25* on therapy before picture dates, including the August of 2013 picture date.

171.   *Patient 24* needed constant nursing assistance, and therapy for the patient was not beneficial.   Despite not wanting therapy, *Patient 24* received repetitive, unnecessary therapy prior to picture dates, including the August of 2013 picture date.

172.   *Patient 23* was bedbound and unable to actively participate in therapy, but was repeatedly put on therapy for CMI purposes, including therapy prior to the August of 2013 picture date.

173.   Therapy for *Patient 22* was not medically necessary or reasonable.   The patient suffered from dementia and was combative.   *Patient 22* had no functional gains after therapy, but was put on therapy for CMI purposes prior to picture dates, including in September of 2013, prior to the next picture date.

174.   *Patient 21* suffered from dementia and was at the end stages of his life. Therapy for this patient was not medically necessary or beneficial.   There were no functional gains after therapy, but for CMI purposes, *Patient 21* was put on therapy in September of 2013, prior to the picture date.

175.   *Patient 20* was dependent on nursing for most of the patient's daily activities and not appropriate for frequent therapy, yet therapists were pressured by Guardian to put *Patient 20* on therapy for CMI purposes, including in October of 2013, prior to the picture date.

176.   *Patient 19* did not need therapy.   The patient did not have medical complexities that required nursing assistance and therefore had a low CMI value.   *Patient 19* was subjected to repeated therapy, because Relators and therapists were under constant pressure from Guardian to pick the patient up for therapy for CMI purposes, including therapy in October of 2013, prior to

56

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

the picture date.

177.    Excessive amounts of unnecessary therapy with no benefit or minimal short term gains for CMI purposes was administered prior to picture dates, including prior to the August of 2013 picture date to *Patient 14, Patient 47, Patient 48, Patient 49, Patient 50, Patient 44, Patient 23, Patient 51, Patient 52, Patient 36, Patient 53, Patient 45, Patient 54,* and *Patient 55*.

178.    Similarly, in order to achieve the inflated CMI in 2012 and 2013, medically unnecessary therapy was provided to *Patient 5, Patient 20, Patient 33, Patient 6, Patient 14, Patient 54, Patient 56, Patient 31, Patient 57, Patient 58* and others.

179.    Not only does this unnecessary therapy increase Guardian's Medicaid funding through the resulting increase in CMI, but Guardian was and is reimbursed by Medicare Part B for the therapy itself.

180.    Relators Krauss and White voiced their concerns to Guardian Management about its constant pressuring to treat patients with medically unnecessary and excessive therapy. Starting in June of 2012, Relator Krauss began voicing her concerns to Guardian Management including to Regional Rehab Manager Erica Daub when she communicated with her every six weeks.   Krauss told Daub about her concerns regarding instructions to provide unnecessary therapy during her performance review in November of 2012.   Every time Krauss voiced her concerns, Daub went over strategies to meet company demands and repeated instructions given by Nursing Home Administrator Boyne-Stauffer to find creative ways to get the needed therapy minutes, *i.e.* using modalities.   Krauss often refused to do things that were not medically appropriate, despite constant pressure from management.   Twice, after Krauss refused to follow instructions to pick up patients for unnecessary therapy, Daub threatened to call the Guardian Rehab Executive Director Rhonda Gallagher to report that Krauss was refusing to meet the

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

benchmarks that were part of a Rehab Manager's job description.   On one occasion, after a meeting on January 18, 2013, Krauss told Daub that she would not follow the instructions to pick up patients who did not need therapy.   Daub made a show of walking up to the phone and picking it up to call Gallagher.   She did not dial, but took Krauss to *Patient 45*'s room and showed Krauss how to find justification for placing the patient on therapy (as described in more detail in Para. 158).   Knowing that Krauss was upset after the meeting, Daub called her at home on January 20th.During the call, Relator Krauss told Daub that she was resigning because she could not meet the company's benchmark requirements and could not handle the pressure of doing the wrong thing. Relator Krauss resigned on February 15, 2013.

181.   Even though White was promoted to a Rehab Manager, she was never given any training, despite her repeated requests to be trained.   She relied on the Regional Rehab Manager Erica Daub for guidance and instructions.   At the end of 2013 and during the first half of 2014, Relator White voiced her concerns to Daub, Shrader, and Hockenberry about Guardian's pressure to provide unnecessary therapy to patients.   Shrader and Hockenberry did not address her concerns.   Daub reviewed patient's charts and found creative ways to justify keeping patients on unnecessary aggressive therapy.   White continued to voice her concerns, until she was fired. On June 23, 2014, a staff member reported a violation in a time entry log monitored by White and used this incident as an opportunity to accuse Guardian of Medicaid violations.   Guardian used White as a scapegoat and White was terminated on June 26, 2014.

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

## VII.  COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[21]
### Against All Defendants

182.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

183.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

184.   By virtue of misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented, or caused to be presented false or fraudulent claims for improper payment for medically unnecessary, unreasonable and unskilled therapy treatments, length of stay, and CMI by Medicare and Medicaid in violation of 31 U.S.C. §3729(a)(1)[1986], and 31 U.S.C. §3729(a)(1)(A)[2009].

185.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

186.   By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount and is entitled to recover treble damages and a civil penalty for each false claim.

---

[21] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1).

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

## COUNT TWO[22]
## Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
## Against All Defendants

187.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

188.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

189.    During the Relevant Time Period, Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States.   Specifically, Defendants knowingly submitted false quarterly CMI reports to the Governement Plaintiff and false MDS data directly to CMS which improperly inflated Defendants' Medicaid funding and Medicare Part A and B reimbursement.   Defendants' false reports caused the United States to pay inflated Medicaid and Medicare claims in violation of 31 U.S.C. §3729(a)(1)(B).

190.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

191.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount and is entitled to recover treble damages and a civil penalty for each false claim.

---

[22] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*  31 U.S.C. § 3730(a)(2).

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

## COUNT THREE[23]
## Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
## Against All Defendants

192.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

193.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

194.    By virtue of misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and/or(a)(1)(B).

195.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

196.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Relators request that judgment be entered against Defendants, ordering that:

A.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

B.    Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

---

[23] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*  31 U.S.C. § 3730(a)(3).

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

C.   Relators be awarded the maximum amount of relators' share allowed pursuant to §3730(d) of the False Claims Act;

D.   Relators be awarded all costs of this action, including attorneys' fees and expenses;

E.   Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and,

F.   The United States and Relators recover such other relief as the Court deems just and proper.

## IX.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relators hereby demand a trial by jury.

Dated:  December 30, 2015                    Respectfully submitted:

**FARUQI & FARUQI, LLP**

T. Talyana Bromberg
Timothy J. Peter
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: tbromberg@faruqilaw.com
          tpeter@faruqilaw.com

*Attorneys for Relators Philippa Krauss and Julie White*

# EXHIBIT A

**<u>Pennsylvania:</u>**

Beaver Elder Care and Rehabilitation Center ("Beaver")
616 Golf Course Road
Aliquippa, PA 15001
Certified SNF for 67 beds

Belle Haven Skilled Nursing and Rehabilitation Center ("Belle Haven")
1320 Mill Road
Quakertown, PA 18951
Certified SNF for 59 beds

Brookline Manor and Rehabilitative Services ("Brookline")
2 Manor Boulevard
Mifflintown, PA 17059
Certified SNF for 85 beds

Carleton Senior Care and Rehabilitation Center ("Carleton")
10 West Avenue
Wellsboro, PA 16901
Certified SNF for 26 beds

Darway Elder Care Rehabilitation Center ("Darway")
5865 Route 154
Forksville, PA 18616
Certified SNF for 67 beds

Epworth Manor ("Epworth")
951 Washington Avenue
Tyrone, PA 16686
Certified SNF for 102 beds

Forest Park Health Center ("Forest Park")
700 Walnut Bottom Road
Carlisle, PA 17013
Certified SNF for 114 beds

Guardian Elder Care Center ("GECC")
147 Old Newport St
Nanticoke, PA 18634
Certified SNF for 110 beds

Highland View Health Care ("Highland View")
90 Main Street
Brockway, PA 15824
Certified SNF for 50 beds

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Highlands Care Center ("Highlands")
Route 42 Main Street
Laporte, PA 18626
Certified SNF for 120 Beds

Jefferson Hills Manor ("Jefferson Hills")
448 Old Clairton Road
Jefferson Hills, PA 15025
Certified SNF for 83 beds

Lakeview Senior Care and Living Center ("Lakeview")
15 West Willow Street
Smethport, PA 16749
Certified SNF for 34 beds

Meadow View Senior Living Center ("Meadow View")
225 Park Street
Montrose, PA 18801
Certified SNF for 63 beds

Milford Senior Care and Rehabilitation Center ("Milford")
264 Route 6 & 209
Milford PA 18337
Certified SNF for 80 beds

Mountain Top Senior Care and Rehabilitation Center ("Mountain Top")
185 S Mountain Boulevard
Mountain Top, PA 18707
Certified SNF for 106 beds

Mulberry Square Elder Care & Rehabilitation ("Mulberry Square")411 1/2 West Mahoning
Street
Punxsutawney, PA 15767
Certified SNF for 75 Beds

Richfield Senior Living and Rehab Center ("Richfield")
Po Box 248, 631 Main Street
Richfield, PA 17086
Certified SNF for 40 beds

Ridgeview Elder Care Rehabilitation Center ("Ridgeview")
30 4th Avenue
Curwensville, PA 16833
Certified SNF for 131 beds

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

Rolling Hills Manor ("Rolling Hills")
17350 Old Turnpike Road
Millmont, PA 17845
Certified SNF for 57 beds

Scenery Hill Manor, Inc. ("Scenery Hill")
680 Lions Health Camp Road
Indiana, PA 15701
Certified SNF for 56 beds

Scottdale Manor Rehab Center ("Scottdale")
900 Porter Avenue
Scottdale, PA 15683
Certified SNF for 35 beds

Weatherwood Nursing Home and Rehabilitation Center ("Weatherwood")
1000 Evergreen Avenue
Weatherly, PA 18255
Certified SNF for 200 beds

## **Ohio**

Eastland Health Care & Rehabilitation Center ("Eastand")
2425 Kimberly Pkwy East
Columbus, OH 43232
Certified SNF for 93 beds

Ivy Woods Manor ("Ivy Woods")
9625 Market Street
North Lima, OH 44452
Certified SNF for 91 beds

Lost Creek Health Care & Rehabilitation Center ("Lost Creek")
804 S. Mumaugh Road
Lima. OH 45804
Certified SNF for 70 beds

Minerva Convalescent Center "(Minerva")
1035 East Lincolnway
Minerva, OH 44657
Certified SNF for 34 beds

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)

## West Virginia

Peterson Rehabilitation Hospital & Geriatric Center ("Peterson")
20 Homestead Ave.
Wheeling, WV 26003
Certified SNF for 150 beds